# LAW OFFICES OF KARL J. STOECKER

22 Jericho Turnpike, Suite 100 East
Mineola, New York 11501
Phone: (212) 818-0080
Facsimile: 212-818-9055

April 21, 2008

**VIA ECF**
Hon. Mark D. Fox
United States Magistrate Judge
United States Courthouse
300 Quarropas St., Room 434
White Plains, NY 10601

Re: *Morocho, et al. v. Kelly, et al., No. 07 Civ. 2979 (CLB)(MDF)*

Dear Judge Fox:

We represent plaintiffs in the above-referenced action. We submit this

letter in support of plaintiffs' motion for sanctions and to put before the Court certain

material relevant to the hearing to be held on Wednesday, April 24, 2008 regarding Mr.

Satriale's conduct at the deposition of non-party witness John Occhino.[1]

By way of background, deponent John Occhino is the principal of J&M

Enterprises, an accounting firm that performed tax preparation and accounting services

for the defendants at all times relevant to this lawsuit. Defendant George Kelly identified

Mr. Occhino as a person with knowledge of defendant's payroll practices and Mr.

Occhino prepared tax returns for defendants during the relevant period. Given

defendant's admitted failure to maintain or preserve payroll records – and defendants'

---

[1] To the extent this submission is deemed to be governed by the page limitations set forth in Your Honor's
Order dated March 5, 2008, plaintiff respectfully begs the Court's indulgence in exceeding those
limitations given the number, importance and complexity of the issues addressed herein.

spoliation of payroll evidence *after* the commencement of this action[2] - defendants' tax returns are the principal extant documentary evidence regarding the payroll practices which underlie plaintiffs' claims for overtime compensation and misappropriation of tips.[3] Mr. Occhino was deposed pursuant to a subpoena served by plaintiff's counsel, on March 7, 2008, at the offices of plaintiffs' co-counsel Karen Zdanis.

Unfortunately, the conduct of counsel for defendants, Mr. Louis Satriale, prevented plaintiffs from taking a meaningful deposition of this non-party witness and has thereby severely prejudiced plaintiffs' prosecution of this action. As discussed in detail below, that conduct included: (i) directing the witness not to answer questions on grounds other than privilege; (ii) initiating private conferences with the witness while questions were pending; (iii) improperly coaching and testifying for the witness; (iv) interposing numerous "speaking" and other improper and frivolous objections[4]; (v) and tampering with the witness and other improper and objectionable conduct.

### Mr. Satriale Intercepts, Withholds and Precludes Inquiry<br>Regarding Documents Responsive to Plaintiff's Non-party Subpoena

The deposition's tone was set at the outset when Mr. Satriale directed this non-party witness to confer with him outside the deposition room while a question was pending. Tr. at 5. Thereafter, Mr. Satriale blocked our efforts to elicit testimony regarding documents responsive to plaintiffs' subpoena. Occhino Tr. at 26-35. It is beyond peradventure that plaintiffs are entitled to know what responsive documents this

---

[2] Transcript of the Deposition of George Kelly taken on January 15, 2008 at 30-38, 65-70.

[3] At the conference on April 1, 2008, the Court ordered defendants to produce signed tax returns. Thus far, however, they have failed to do so. In addition to being unsigned, the tax returns – indeed all of the documents defendants have produced in this litigation - were so heavily redacted that it has been impossible to piece together defendants' payroll practices in any fashion.

[4] See, e.g., Tr. 16, 27, 74, 76, 79, 82 and particularly 89-94.

non-party witness possessed.  Mr. Satriale, however obstructed and prevented all such inquiry by diverting the non-party witnesses' production of responsive documents to himself. Tr. at 27, 30-31. ("Mr. Satriale: ' . . . let me shortcut this we've given you everything that we've been required to give you").[5]  To make matters worse, Mr. Satriale then instructed the non-party witness to refrain from answering questions regarding his alleged retention of Mr. Satriale and insisted that counsel for plaintiffs "get over it." Occhino Tr. 33-35.[6]  Particularly disturbing was the witnessess' eventual concession that he retained Mr. Satriale "through my client" indicating that defendant may have effectively *paid this non-party witness for his testimony* by paying for his representation by Mr. Satriale.  The latter, however, obstructed and precluded all testimony in that regard. Tr. 31-35.

### Mr. Satriale's Misconduct Precluded
### Plaintiffs From Eliciting Crucial Dispositive Evidence

Mr. Satriale's most egregious offence, however, involved his shouting down and silencing the witness as the latter was giving crucial testimony on the most significant claim in this action.

By way of background, the Lion's share of plaintiff's' damages herein arises from defendants' alleged practice of unlawfully confiscating gratuities. We accordingly sought to elicit testimony from Mr. Occhino regarding the allocation of tips as reflected on the tax returns he prepared for the defendants.  In response to a question concerning the latter, just as Mr. Occhino began reciting crucial testimony that plaintiff Morocho's W-2 confirmed that there were *"no allocated tips,"* Mr Satriale interrupted

---

[5] Significantly, the Court has not made any rulings on what this non-party witness was required to furnish plaintiffs in response to their subpoena.

and silenced the witness thereby preventing him from testifying on this crucial, dispositive issue. Occhino Tr. 48-49.

Have effectively tainted the witness' testimony, the succeeding fifteen pages of the transcript consisted of an unavailing effort to obtain meaningful testimony from the witness regarding this crucial issue. Apparently cowed by Mr. Satriale's stern admonitions and subsequent frivolous "speaking" objections, the witness' testimony on this issue was thereafter so riddled with contradictions and inconsistencies as to be virtually unintelligible. Tr. 50-64.

### Mr. Satriale Mis-Characterises and Mis-States Off-The-Record Comments

Unfortunately, the deposition thereafter devolved further. As set forth below, however, most of allegedly improper off-the-record comments were immediately recited on the transcript such that there is a contemporaneous record of what was actually said. That record unequivocally and conclusively demonstrates that Mr. Satriale conflated, what the transcript reflects, was actually two separate off-the-record exchanges and that he then misrepresented to the Court what occurred during each.

The first off-the-record exchange at issue was initiated at page 64 of the transcript. During the course of a lengthy exchange in the wake of Mr. Satriale's misconduct described above, I stated *"this* is an embarrassment."[7] At the March 10th Conference before Your Honor, however, Mr. Satriale, represented to the Court that I stated *to the witness*: "This is a joke. *You're* an embarrassment."[8] (emphasis added) The transcript confirms that this representation to the Court was false. Mr. Satriale correctly

---

[7] During the course of this same exchange, Mr. Satriale state that "plaintiffs' depositions were pathetic."

[8] A copy of the transcript of the March 10, 2008 conference is annexed hereto as Exhibit C.

recounted my actual off-the-record comment immediately after it was made, on the

record, at the deposition:

> "Satriale:  Are you going to deny on the
> record that you said, "*this* is an embarrassment."

Tr. 66. (emphasis added). Mr. Satriale's contemporaneous recitation of the exchange thus

flatly contradicts his representations to the Court at the March 10th conference.

    The second off-the-record exchange was initiated at page 67 of the

transcript. Mr. Satriale conflated this latter exchange with that set forth in the preceding

paragraph and, again, his representations to the Court substantially differed from his

contemporaneous recounting of the exchange, on the record, at the deposition. Thus,

while Mr. Satriale represented to the Court that I stated: "This is a joke. You're an

embarrassment[,]" at the deposition he characterized my comments as follows: "either

calling the witness or saying that *this* is a joke."  Tr. 68.

    In sum, Mr. Satriale's representations to the Court regarding my alleged

off-the-record comments substantially differed from his contemporaneous on-the-record

characterizations made within seconds of their occurrence.[9]  Plaintiffs respectfully submit

that the Court should give more weight to this, more probative, contemporaneous

evidence and that Mr. Satriale's demonstrably false and self-serving representations to

the Court at the March 10th conference should be appropriately discounted.[10]

---

[9] During the Course of the second off-the-record exchange with Mr. Satriale, the witness abruptly got up and said he was leaving the deposition at which point I said: "do you think *this* is a joke - you can't just leave."  Tr. 68 ("I asked the witness if he thinks that *this* is a joke.")

[10] In the event that the Court determines to go forward with the hearing on April 24, 2008, plaintiff respectfully requests the presence of a court reporter.  In addition, at the telephonic conference on April 1, 2008, plaintiffs' counsel requested that the Court disqualify Mr. Satriale from representing, the non-party deponent at the hearing given that the latter will be testifying regarding Mr. Satriale's misconduct at the deposition, including, among other things, Mr. Satriale's statement that "plaintiffs' depositions were pathetic."  The Court reporter's office has advised that there is no tape-recording of Your Honor's ruling

In conclusion, plaintiffs respectfully submit that tertiary satellite litigation, including a full-dress hearing, regarding off-the-record comments by both attorneys is unnecessary. The comments at issue were recited on the record by Mr. Satriale immediately after they were made and plaintiffs, by and large, do not take issue with that record evidence. The alleged comments, moreover, in no way prejudiced the parties' substantive rights. Mr. Satriale's otherwise egregious and undeniably sanctionable misconduct at the deposition is unequivocally reflected on the record and can be addressed without a hearing. That misconduct is what effectively precluded plaintiffs from obtaining meaningful testimony regarding dispositive issues in this action and thereby substantially prejudiced plaintiffs' substantive rights.

Respectfully submitted,

Karl J. Stoecker

cc: Louis R. Satriale, Esq.
    Karen Zdanis, Esq.

---

denying plaintiff's request. We accordingly respectfully request the creation of a written record to preserve plaintiffs' rights.

# EXHIBIT A

---

**Page 1**

```
1
2    UNITED STATE DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3
     ------------------------------------------X
4
     FREDDY M. MOROCHO, WALTER TACURE on
5    behalf of themselves and others similarly
     situated,
6
                   Plaintiff(s),
7
       - against -      Index # 07 CIV. 2979
8
     GEORGE C. KELLY and NYACK COLONIAL
9    CAR WASH, INC.,
10                 Defendant(s).
11   ------------------------------------------X
12        Karen Zdanis, Esq.
          20 North Broadway, Suite 5
13        Nyack, New York, 10960
14        January 15, 2008
          12:00 PM
15
16        EXAMINATION BEFORE TRIAL of GEORGE
17   KELLY, the Defendant herein, taken by the
18   attorney for the Plaintiff, pursuant to Notice,
19   and held before Kathleen Anderson, a Notary
20   Public of the State of New York, at the above
21   stated time and place.
22
23              *   *   *
24
25
```

---

**Page 2**

```
1
2    APPEARANCES:
3      KAREN ZDANIS, ESQ.
          Attorney for Plaintiff(s)
4         20 North Broadway Suite 5
          Nyack, New York, 10960
5
     BY:  KAREN ZDANIS, ESQ.
6
7
8
9
     LAW OFFICES OF KARL J. STOECKER
10        Attorney for Plaintiff(s)
          18 East 41 Street Suite 1501
11        New York, New York, 10017
12   BY:  KARL J. STOECKER, ESQ.
13
14
15
16   GEHRIG & SATRIALE, LLC
          Attorney for Defendant(s)
17        370 Lexington Avenue Suite 1200
          New York, New York, 10017
18
19   BY:  LOUIS SATRIALE, ESQ.
20
21
22
23   ALSO PRESENT:
24        FREDDY MOROCHO
          (12:00 - 1:10 PM)
25
```

---

**Page 3**

```
1
2        IT IS HEREBY STIPULATED AND AGREED by and
3    between the attorneys for the respective
4    parties hereto, that the sealing, filing and
5    certification of the transcript of the within
6    examination before trial be, and the same
7    hereby are waived;  and that said transcript
8    may be signed and sworn to before any Notary
9    Public or Commissioner of Deeds with the same
10   force and effect as if before an officer of
11   this Court.
12       IT IS FURTHER STIPULATED AND AGREED that
13   all objections, except as to the form of the
14   question, are reserved to the trial of this
15   action.
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1                   G. KELLY
2    G E O R G E   K E L L Y,
3        The witness herein, having been first
4    duly sworn by Kathleen Anderson, a Notary
5    Public in and for the State of New York, was
6    examined, and testified as follows:
7    DIRECT EXAMINATION BY KARL STOECKER, ESQ.:
8        Q    What is your name?
9        A    George Kelly.
10       Q    What is your address?
11       A    135 Goebel Road, New City, New York,
12   10956.
13       Q    Mr. Kelly, my name is Karl Stoecker,
14   I'm one of the attorneys for the Plaintiff in
15   this case.  I will be asking you a series of
16   questions--
17       A    Okay.
18       Q    About the case--
19       A    Right.
20       Q    And about this car wash--
21       A    Okay.
22       Q    Or car washes, and if you don't
23   understand any of the questions, just let me
24   know?
25       A    Right.
```

---

1 (Pages 1 to 4)



29

G. KELLY

1
2    A    Right.
3    Q    And then what, after you put in your
4 personal code?
5    A    It's not a personal code, it's an
6 access code for the printer.
7    Q    Who has that code?
8    A    I have it, it's a common code, it's
9 1234, it's just a common code.
10    Q    But you have it?
11    A    Right.
12    Q    And who else?
13    A    Just me.
14    Q    And after you put in your code, what
15 do you see on the screen?
16    A    It will come up the date, I put the
17 date in, then I hit enter and it prints it.
18    Q    You put the date that you want to see
19 the hours for?
20    A    Right.
21    Q    And that would be, what day would
22 that be, if you are going to the machine on
23 Monday, what day would you look at the hours
24 for, the preceding Sunday?
25    A    It would start the first Monday.  I

30

G. KELLY

1
2 start the date on that Monday.
3    MS. ZDANIS:  He means last week?
4    A    Yeah.
5    Q    Okay, so you put in the code, and
6 then what do you see on the screen?
7    A    The date, and I adjust the date to
8 the day I want, and then I push enter and it
9 prints it.
10    Q    So the date that you would put is the
11 preceding Monday?
12    A    Correct.
13    Q    And then it prints out all the hours
14 that were put into the machine by any employee
15 on that Monday?
16    A    Correct.
17    Q    And then you do Tuesday, Wednesday,
18 each day separately?
19    A    Correct.
20    Q    Where does it print out?
21    A    On a machine in my office.
22    Q    A printer?
23    A    Printer.
24    Q    What does it look like?
25    A    It's a Dot Matrix Printer, the-- I

31

G. KELLY

1
2 think that's what they call it, with the rip.
3    Q    And what is the, what does the format
4 look like?
5    A    It just lists the names and hours.
6    Q    It lists the name for each day, like
7 Monday?
8    A    Right, Monday, and then another
9 sheet.
10    Q    And then Tuesday it lists the names
11 and hours?
12    A    Correct.
13    MR. STOECKER:  Off the record.
14    (Whereupon, an off the record
15    discussion was held.)
16    Q    And then what do you do with those
17 sheets after they print out?
18    A    They go into a spreadsheet, Excel
19 spreadsheet.
20    Q    You put, manually enter them into a
21 spread sheet?
22    A    Correct.
23    Q    And after you've entered them into
24 the spread sheet, what do you do with the
25 sheets, the Dot Matrix printouts?

32

G. KELLY

1
2    A    What do I do with those sheets?
3    Q    Yeah.
4    A    I throw them away.
5    Q    Now, the time clock, itself, how far
6 back can you go to get data from it?
7    A    A week.
8    Q    And what happens to the data from the
9 preceding week?
10    A    I don't know, it just disappears, I
11 don't know what happens to it.
12    Q    You don't know?
13    A    No.
14    Q    Have you ever tried to go back two
15 weeks to get data?
16    A    No.
17    Q    Have you ever tried to go more than a
18 week?
19    A    More than a week, no.
20    Q    Do you know the manufacturer of that
21 time clock?
22    A    Time Banc.
23    Q    How do you spell that?
24    A    T I M E, B A N C.
25    Q    Does it have a model number?

8 (Pages 29 to 32)



Page 33

G. KELLY

1
2   A   I don't know.
3   Q   Do you know if it has a hard drive on
4   it?
5   A   I don't know.
6   Q   Does the machine have a name?
7   A   Time Banc.
8   Q   That's the name of the machine or the
9   manufacturer or both?
10  A   That's the name of the machine,
11  that's on the machine.
12  Q   It says Time Banc?
13  A   Time Banc.
14  Q   Do you know who makes the machine?
15  A   No.
16  Q   Did you ever have to get maintenance
17  on the machine?
18  A   No.
19  Q   Did you have to get troubleshooting
20  done on the machine?
21  A   No.
22  Q   It's worked without any problems in
23  the eight years you've been there, as far as
24  you know?
25  A   As far as I know.

Page 34

G. KELLY

1
2   Q   And it's the same machine that's been
3   there the whole time?
4   A   Yes.
5   Q   Now, you say you enter the hours data
6   onto a spreadsheet, what program do you use?
7   A   I think it's Excel.
8   Q   And then what happens after you enter
9   it into the spreadsheet?
10  A   After I enter in the times in the
11  time sheet, into the spreadsheet, yeah, it
12  gives me a total of what I owe the guys who
13  worked.
14  Q   For the preceding week?
15  A   Uh, huh. Yes.
16  Q   Now, the ten employees that you
17  mentioned, can you describe for me how they are
18  paid? That is by the hour or by the week?
19  A   By the week.
20  Q   They get a flat rate?
21  A   No, by the hour.
22  Q   By the hour?
23  A   Yes.
24  Q   All ten of them?
25  A   Yes.

Page 35

G. KELLY

1
2   Q   Paid by the hour?
3   A   Presently, yes.
4   Q   Does each one have a different hourly
5   rate?
6   A   Yes.
7   Q   So the spreadsheet automatically
8   calculates for each employee their hourly rate
9   multiplied by the number of hours they worked?
10  A   Yes.
11  Q   You don't have to manually do that?
12  A   No.
13  Q   Is the spreadsheet programmed to
14  calculate time and a half in instances where an
15  employee works more than 40 hours in a week?
16  A   On the Time Banc machine?
17  Q   No, spreadsheet program, the Excel
18  program that you use?
19  A   No.
20  Q   Did you program the Excel
21  spreadsheet, yourself, or did someone do that
22  for you?
23  A   No, somebody did it.
24  Q   Who did it?
25  A   I'm not sure, it's been there since

Page 36

G. KELLY

1   I've been there.
2
3   Q   And when you do the payroll each
4   week, do you save the excel file? You put it
5   on, you save it onto the computer?
6   A   No, I print it.
7   Q   And then what happens?
8   A   I don't understand what happens then,
9   as to what?
10  Q   You put the data in Excel and Excel
11  does the calculation?
12  A   Right.
13  Q   And then you print out a sheet?
14  A   Right.
15  Q   Which shows how much you should pay
16  each employee?
17  A   Correct.
18  Q   And what do you do with the-- you
19  exit out of Excel at some point?
20  A   Right.
21  Q   After first saving the file; correct?
22  A   No, well, I clear it, for the next
23  week.
24  Q   You clear it?
25  A   For the next week, yeah.

9 (Pages 33 to 36)

37

G. KELLY
1
2    Q   You take the data out of each--
3    A   Yeah, because I use the same sheet
4 every week.
5    Q   Okay.  So you physically take the
6 data off of the computer screen that you've
7 just entered into it?
8    A   That's correct.
9    Q   You go through each cell and you
10 delete the data?
11    A   I copy the sheet, I pay everybody,
12 and then I clear everything off the sheets to
13 start the next week.
14    Q   Okay.  Well, if you wanted to look at
15 payroll for a month ago, on your Excel
16 spreadsheet on the computer, could you do that?
17    A   No.
18    Q   You would have to look at the hard
19 copy sheet that you printed out as far as you
20 know?
21    A   Yes.
22    Q   So the sheets that you print out each
23 week from Excel you save; correct?
24    A   No.
25    Q   What do you do with those?

38

G. KELLY
1
2    A   I throw them out.
3    Q   You throw them out?
4    A   Yes.
5    Q   How do you prepare payroll taxes at
6 the end of the year?
7    A   My accountant does it.
8    Q   What does he look at to do that?
9    A   He goes off of the hours the guys
10 work a week.
11    Q   How does he know how many hours they
12 work a week?
13    A   I'm not sure how the accountant does
14 it but we have the sheets, we have a payroll,
15 there's a sheet that he looks at in our books
16 that have the payroll.
17    MR. STOECKER:  Well, we request a
18 copy of the hard drive from the computer
19 that is used at the Nyack Soft Cloth Car
20 Wash to prepare the payroll.  And also a
21 copy of the electronic data that's stored
22 on the Time Banc, time keeping machine,
23 as well as any data that has been
24 retained from the past in any form,
25 whether electronic or paper from the Time

39

G. KELLY
1
2 Banc machine or the Excel payroll
3 spreadsheet.
4    MR. SATRIALE:  We will take your
5 requests under advisement, I would just
6 ask that when this is over to put them in
7 writing so we will have them all in one
8 place.
9    MR. STOECKER:  Off the record.
10    (Whereupon, an off the record
11 discussion was held.)
12    Q   So your testimony is that after you
13 do the printout of the Excel spreadsheet, you
14 pay your employees and you throw the printout
15 out?
16    A   Uh, huh.
17    MR. SATRIALE:  You have to answer.
18    A   Yes.
19    Q   That's your testimony?
20    A   Yes.
21    Q   Okay.  So where is the payroll
22 information saved?
23    A   It's not saved.
24    Q   Well, your accountant gets it from
25 somewhere; correct?

40

G. KELLY
1
2    A   Yes.
3    Q   And you give it to him; correct?
4    A   No.
5    Q   Where, how does he get it?
6    A   He has it for how many guys, what
7 they work each week.
8    Q   Who gives it to them?
9    A   I tell them they worked this amount
10 of hours this week.
11    Q   Where do you get the information
12 from?
13    A   It's the same every week.
14    Q   So you just tell your accountant they
15 worked the same amount of hours each week?
16    A   Yes.
17    Q   Do you tell them that verbally?
18    A   It's on the sheet, it's on the sheet.
19    Q   What sheet is that?
20    A   I don't know what the sheet's called,
21 it's something in the employee book, I have a
22 sheet of their Social Security numbers and
23 names and all that, and it's a yellow sheet.
24 I'm not sure what that is.
25    Q   What book is it that you're referring

10 (Pages 37 to 40)

# EXHIBIT B

1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    -----------------------------------------

5

6    MOROCHO, ET AL,

7                        07 CIV 2979 (CLB) (MDF)

8              Plaintiff,

9              -against-

10   KELLY, ET AL,

11             Defendant.

12   -----------------------------------------

13                        20 North Broadway
                          Nyack, New York
14                        March 7, 2008
                          1:15 P.M.
15

16

17

18        EXAMINATION BEFORE TRIAL of JOHN OCCHINO,

19   held at the above place and time, before a

20   Notary Public within and for the State of New

21   York.

22

23

24

25

5

```
 1                         J. Occhino

 2      Q.   Have you been deposed before?

 3      A.   Not for this case, no.

 4      Q.   Have you been deposed before in any

 5  other content?

 6      A.   Yes.

 7      Q.   Can you tell me about that?

 8      A.   Is it relevant to these proceedings?

 9           It's just a matter that I was

10  involved in, so.

11      Q.   What was the nature of the matter?

12      A.   It is in relation to a previous

13  employer.

14      Q.   Were you a party to that lawsuit?

15      A.   I was named, I was the person they

16  were suing.

17      Q.   You were a defendant?

18      A.   Yeah.

19      Q.   What were they suing for?

20      A.   I don't think it's relevant to this

21  case.

22      Q.   Well, you have to answer, sir.

23           MR. SATRIALE:  Let me take a

24      break and talk to Mr. Occhino outside.

25           (Conference outside the room
```

16
1                    J. Occhino

2       A.    I don't know.

3       Q.    You don't know?

4       A.    I don't know.

5       Q.    Do you know who the owners of your

6    client are?

7       A.    Yes, I do.

8       Q.    Who are the owners?

9       A.    It's Tim Weigel.

10      Q.    Yeah?

11      A.    And I believe Jim Miner and John

12   Weigel.

13      Q.    Jim Miner and who else?

14            MR. SATRIALE:  Don't guess.

15   If you know --

16            MR. STOECKER:  He didn't say

17   he was guessing.  He told me a name.

18   Now don't coach him.

19            MR. SATRIALE:  Mr. Stoecker,

20   please, I'm allowed to talk as well.

21            MR. STOECKER:  You can't coach

22   the witness.  He knows not to guess.

23   He knows that.

24            MR. SATRIALE:  No, you didn't

25   tell that yet.

26

1                          J. Occhino

2     without looking at the paperwork.  But the

3     other ones they've been around for a long

4     time, yes.

5          Q.    Okay.  Now, with respect to Nyack

6     Colonial Car Wash, Inc., can you describe in

7     detail the work you do for that company?

8          A.    I go there, I see them monthly.  I

9     do their bank rec.  I take information --

10    and I do their sales tax every quarter.  I

11    do their payroll every quarter.  And then I

12    post the books, you know, prepare the books

13    and records.  Prepare the tax returns at the

14    end of the year.  I guess that's pretty

15    much, that's pretty much the scope of work.

16         Q.    When you say "prepare the books and

17    records," what do you mean by that?

18         A.    I take their information back to my

19    office, put it in the computer so I'm able

20    to do the tax returns at the end of the

21    year.

22         Q.    Did you receive a subpoena to

23    appear here today?

24         A.    Yes, I did.

25         Q.    And did that subpoena request that

27

J. Occhino

2  you bring copies of documents regarding

3  Nyack Colonial Car Wash, Inc.?

4      A.   I don't remember if it did or not.

5  It's been awhile ago since it's been

6  postponed so many times, I don't remember if

7  it did or not.

8      Q.   Have you brought any documents with

9  you today?

10     A.   Anything I brought I gave to the

11 attorney, you have.

12     Q.   What is it that you gave to the

13 attorney?

14     A.   Whatever was requested.

15     Q.   Can you tell me what you gave to

16 the attorney?

17          MR. SATRIALE:  He gave me, he

18      gave me the unredacted tax returns.  He

19      gave me all the W-3 information I gave

20      you today, the W-3, W-2 forms.  And he

21      gave me, he's given me -- let me

22      shortcut this -- we've given you

23      everything that we've been required to

24      give you by the judge.

25          MR. STOECKER:  You haven't

28

```
 1                    J. Occhino

 2       been required to give me anything,

 3       Mr. Satriale, the witness has.  I

 4       mean my question is --

 5                    MR. SATRIALE:  No, actually

 6       the witness -- no, we can shortcut

 7       this.  The subpoena that you served

 8       many, many weeks or months ago, we

 9       objected to the document production

10       that was requested.  As you know

11       there's been a number of discovery

12       disputes before Judge Fox twice this

13       past week.  We have now given you all

14       the documents we were asked to give you

15       by Judge Fox.  So there are -- so, he

16       has with him no other records other

17       than what you have.

18                    MR. STOECKER:  Okay.

19                    MR. SATRIALE:  That we were

20       asked to give.

21                    MR. STOECKER:  Well, now

22       you're putting words into the witness'

23       mouth.  So, let's --

24                    MR. SATRIALE:  We're not

25       giving you any other documents.
```

29

1                    J. Occhino

2              MR. STOECKER:  Well.  Okay.

3        We'll get to that in a minute.

4              MR. SATRIALE:  Okay.

5        Q.   Now, I take it you prepared -- when

6    you say prepare books and records, are you

7    talking about tax filings?

8        A.   No, I'm just talking about

9    inputting information into my computer to

10   prepare the tax returns eventually.

11       Q.   Okay.  So you do input information

12   into the computer that you use to prepare

13   the tax returns?

14       A.   Yes, that's correct.

15       Q.   And you didn't give that

16   information to anyone; correct, in

17   connection with the subpoena?

18       A.   I gave you copies --

19       Q.   Please answer the question.

20              MR. SATRIALE:  Answer his

21       question.

22       A.   I'm sorry.  Say the question again.

23       Q.   The information that you put into

24   your computer to prepare the tax returns --

25       A.   Yes.

30

J. Occhino

2      Q.    -- you haven't given that to

3  anyone; correct?

4      A.    Yes, I have.

5      Q.    Who have you given that to?

6      A.    To the attorney.

7      Q.    I'm not talking about the tax

8  filings.

9      A.    I understand.

10     Q.    I'm talking about the information

11  that you put into the computer.

12     A.    That's correct.

13     Q.    You've given that to the attorneys?

14     A.    Yes.

15           MR. STOECKER:  And your

16       representation, Mr. Satriale, is that

17       you have produced that to us?

18           MR. SATRIALE:  I don't know

19       exactly what he's talking about.  I

20       have a sense of what he's talking

21       about.  But the answer to that question

22       is if it's what I think it is, you have

23       it to the extent that we were required

24       to give it to you.

25           MR. STOECKER:  Well, let me

31

                        J. Occhino

1

2      ask you this then:  Has everything that

3      the accountant has given you been given

4      to us?

5              MR. SATRIALE:  I'm not being

6      deposed here.  All I'm going to say

7      is --

8              THE WITNESS:  Yes.

9              MR. SATRIALE:  No, John.

10             THE WITNESS:  I'm sorry.

11             MR. SATRIALE:  I'm going to

12     tell you we've given you everything

13     Judge Fox asked us to give you.

14             MR. STOECKER:  We subpoenaed

15     the witness, not you.

16             MR. SATRIALE:  And we objected

17     on the witness' behalf, so that's off.

18             MR. STOECKER:  Do you

19     represent the witness?

20             MR. SATRIALE:  Yes.

21             MR. STOECKER:  You've been

22     retained --

23     Q.    Have you retained and paid

24   Mr. Satriale?

25             MR. SATRIALE:  Objection.

32

```
 1                  J. Occhino

 2    Don't answer the question.  I am

 3    here --

 4              MR. STOECKER:  I'm entitled to

 5    an answer to that question.

 6    Q.   Have you retained Mr. Satriale?

 7              MR. SATRIALE:  Yes, you can

 8    answer that question.

 9              MR. STOECKER:  Now, you're

10    coaching the witness.

11    Q.   Have you retained Mr. Satriale; yes

12  or no?

13              MR. SATRIALE:  Karl, I'm not

14    sure what's going on here.

15              MR. STOECKER:  You have no

16    standing to interpose objections to a

17    third-party witness.

18              MR. SATRIALE:  I'm telling

19    you --

20              MR. STOECKER:  You're

21    tampering with this witness.  Okay?

22    Q.   Have you retained --

23              MR. SATRIALE:  Karl, I

24  represent Mr. Occhino.  Period.

25              MR. STOECKER:  No, it's not
```

33

```
 1                    J. Occhino
 2      for you to say.  It's not for you to
 3      say.  Now you're coaching him.  Now
 4      you're coaching him.
 5               MR. SATRIALE:  I represent
 6      him.  Karl, this isn't like a big
 7      mystery.  I represent him.
 8      Q.    Have you retained Mr. Satriale to
 9   represent you?
10      A.    Through my client, yes.
11      Q.    Your client?  So your testimony is
12   that your client -- who?  Which client is
13   that?
14      A.    Nyack Colonial Car Wash.
15      Q.    Your testimony is that Nyack
16   Colonial Car Wash is paying Mr. Satriale to
17   represent you?
18               MR. SATRIALE:  Objection.
19      Don't answer.  I'm directing him not to
20      answer.  You have no right to find out
21      who's paying anybody.
22               MR. STOECKER:  Yes, I do.
23      You're tampering with this witness.
24               MR. SATRIALE:  I'm tampering?
25               MR. STOECKER:  We served a
```

34

```
 1                    J. Occhino

 2      subpoena on a non-party witness.

 3                    MR. SATRIALE:  Karl, get over

 4      it.  We objected to your subpoena.  You

 5      raised it with the judge --

 6                    MR. STOECKER:  You don't have

 7      standing to object to it.

 8                    MR. SATRIALE:  As his attorney

 9      I certainly do.

10                    MR. STOECKER:  I asked him if

11      you --

12                    MR. SATRIALE:  I represent

13      him.

14                    MR. STOECKER:  I asked the

15      witness that and he hasn't given me an

16      answer yet.

17                    MR. SATRIALE:  He said he was

18      retained, he retained me --

19                    MR. STOECKER:  He didn't say

20      that, you're saying that.

21                    MR. SATRIALE:  Karl, look, I

22      represent him.  Move on.  Okay?  Move

23      on.

24                    MR. STOECKER:  We'll go back

25      to the judge.
```

35

1                      J. Occhino

2              MR. SATRIALE:  Good.  We can

3      go back any time you want.  On the

4      issue of I represent him, I'm telling

5      you I represent him.

6              MR. STOECKER:  We're done with

7      this for now.

8              MR. SATRIALE:  Good.  Then

9      move on.

10             MR. STOECKER:  Okay.

11     Q.   Do you prepare financial statements

12  other than tax returns for Nyack Colonial

13  Car Wash, Inc.?

14     A.   No.

15     Q.   Okay.  Now, you said you do work on

16  the payroll?

17             MR. SATRIALE:  Objection to

18     form.

19     Q.   For Nyack Colonial Car Wash Inc.;

20  is that correct?

21             MR. SATRIALE:  I don't think

22     he said that.

23     Q.   You said you do payroll.

24     A.   I said I do payroll reports.

25     Q.   Payroll reports.  Can you tell me

48

1                    J. Occhino

2    according to this W-2?

3        A.    18,200.

4        Q.    Can you describe for me what box

5    number eight, allocated tips, reflects?

6        A.    It reflects --

7        Q.    What is the purpose of that box on

8    the form?

9        A.    The purpose of that box is tips

10   that are allocated between employees, if

11   there was an overage on tips.

12       Q.    What do you mean "overage"?

13       A.    If not all the tips were accounted

14   for, then they would be allocated to the

15   employees accordingly.

16       Q.    Well, but the question I asked you

17   is, what amount -- what is the purpose of

18   the allocated tips box on the W-2 form?

19   What is supposed to go in there?

20       A.    If there was tips that were not

21   allocated to all the employees, then they

22   would have to be based on hours and time or

23   whatever and they would get another number

24   in that box.  But in this case here there

25   was no allocated tips, it was --

49

```
 1                    J. Occhino
 2            MR. SATRIALE:  Just answer the
 3      question --
 4            MR. STOECKER:  Don't interrupt
 5      the witness.
 6            MR. SATRIALE:  I'm not
 7      interrupting anything.  Hold on.  John,
 8      I'm just --
 9            MR. STOECKER:  Don't interrupt
10      the witness when he's answering the
11      question.
12      Q.   Please, continue.
13            MR. SATRIALE:  John, I'm just
14      asking you --
15            MR. STOECKER:  Don't.
16      Listen.  I'm not going to take this.
17            MR. SATRIALE:  Only answer his
18      question.  Okay?  Just answer his
19      question.
20      Q.   Please, continue with your answer.
21      A.   The tips are shown in box seven
22   that he gets.
23      Q.   Box seven is Social Security tips?
24      A.   Yes.
25      Q.   What is Social Security tips?
```

50
```
 1                    J. Occhino
 2        A.    The tips are Social Security tips.
 3        Q.    Okay.  What is Medicaid wages and
 4   tips?
 5                    MR. SATRIALE:  In general or
 6            as it relates to Plaintiff's Exhibit
 7            6?
 8                    MR. STOECKER:  Well, strike
 9            that question.
10        Q.   What is the difference between
11   Social Security tips and allocated tips?
12                    MR. SATRIALE:  In general --
13                    MR. STOECKER:  Yeah.
14                    MR. SATRIALE:  -- or with
15            regards to Plaintiff's Exhibit 6?
16                    MR. STOECKER:  I want to know
17            what his understanding is.
18                    MR. SATRIALE:  Okay.
19        A.    The difference?
20        Q.    Yes.
21        A.    There's no difference, really.
22   They both would be subject to the same tax.
23        Q.    Okay.  So why is there tips in --
24   I'm sorry, why is there a number in Social
25   Security tips and no number in allocated
```

51

1                          J. Occhino

2    tips if they're both the same?

3         A.   They are treated the same.  Doesn't

4    necessarily mean that anything goes in in

5    eight.  Nothing has to go in eight.  Only

6    seven definitely something has to be in that

7    box for payroll.

8         Q.   So your understanding is that if an

9    employee receives tips, he doesn't have to

10   put that in box number eight on his W-2, is

11   that your understanding?

12              MR. SATRIALE:   Objection to

13        form.  That's not what he said.

14        A.   That's not what I said.  I said

15   nothing goes in eight if there's nothing to

16   be allocated to the employee.  Number seven

17   is the box that picks up the tips for all

18   the employees.

19        Q.   For all the employees?

20        A.   Well, this particular employee.  In

21   this case, this is what this one is.

22        Q.   Okay.  I'll will ask you again --

23        A.   Yes.

24        Q.   -- what is the difference between

25   seven and eight?